UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

BOBBY BYRD #299312                    CIVIL ACTION NO. 18-cv-748 SEC P

VERSUS                               CHIEF JUDGE HICKS

DARREL VANNOY                        MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Bobby Byrd ("Petitioner") was charged in Caddo Parish with aggravated flight from an officer. The jury found him guilty by a vote of 11-1. He was adjudicated a fourth felony habitual offender and given a mandatory life sentence. His conviction and sentence were affirmed on appeal, and his post-conviction application was denied. He now seeks federal habeas corpus relief on several grounds. For the reasons that follow, it is recommended that his petition be denied.

### Sufficiency of the Evidence

#### A. Introduction

Police officers attempted an investigatory stop of the van Petitioner was driving, but he then sped away through downtown Shreveport and into Bossier City, where he was eventually captured. He was charged with aggravated flight from an officer, La. R.S. 14:108.1, which includes the intentional refusal of a driver to bring a vehicle to a stop when an officer has reasonable grounds to believe the driver has committed an offense, the officer has given a visual and audible signal to stop, and the driver endangers human life by

committing at least two of certain enumerated acts. The list of acts includes failing to obey a stop sign or traffic signal, and speeding in excess of 25 mph over the limit.

### B. Relevant Facts

Shreveport Police Detective Robert Gordon testified (Tr. 368-404) that he was assigned to the property crimes bureau and in July 2011 was investigating a string of burglaries of Shreveport night clubs. He learned from grainy surveillance video that either a white or Hispanic male likely committed a burglary of the Tiki Bar and Grill, and a photo showed that the suspect drove a light-colored early 90's model Dodge or Chrysler minivan that was missing the right front hubcap. The photos were distributed to the patrol division, and an officer soon reported that the van had been spotted in the Allendale area.

Detective Gordon began searching the area and found the van at the Levingston Motel, which is noted for drug activity and prostitution. The van matched the surveillance photo, including having a missing right front hubcap. The van was unoccupied, and a license plate check indicated that it was registered to a woman from Minden. Detective Gordon parked his unmarked unit nearby and watched until he saw the van leave the parking lot. Gordon could not see the driver to determine whether it was a white or Hispanic male, but he called for marked units to make a traffic stop "so that I could try to identify the driver and obtain more information." He advised his fellow officers that he had a possible burglary suspect operating the vehicle, and he needed to identify the person.

Two or three blocks away, Corporal Morman and Corporal Garrett, in separate cars, made the stop. Gordon also arrived at the scene. Gordon testified that he got out of his car and was approaching the van when it sped away. Gordon activated the lights and siren in

his unmarked car, and he was third in the line of three police cars who began to pursue the van down Texas Street, where the speed limit is 25 miles per hour, in front of the Caddo Parish courthouse and through all of the major downtown intersections. The group crossed the Texas Street bridge across the Red River into Bossier City, where the van turned left on Traffic Street. It went through a residential area where "there was five, or six or so stop signs through there, possibly more," and Gordon slowed down to make sure that he was not T-boned by cross-traffic at the intersections. Gordon said he was not paying close attention to his speedometer, but he thought he was probably going "around 50 miles an hour" while "losing ground pretty rapidly" because he was trying to avoid accidents at the intersections. Detective Gordon was asked if he saw the van commit any traffic infractions. He said that he witnessed :

> stop sign violations, red light violations, travelling at a very high rate of speed. Just blatant disregard for public safety. I never saw brake lights come on at any time he went through an intersection.

Gordon found the van, abandoned after it crashed into a tree near the levee. The two marked police cars that led the pursuit were stopped nearby.

Detective Gordon did a protective sweep of the van to make sure there was no one inside. After finding the van empty, he went down a nearby trail where he encountered two fishermen who said a white male had just run that way a few seconds earlier. A K-9 officer and his dog arrived a few minutes later, and the dog followed a scent in the direction indicated by the fishermen. The trail eventually became impassable due to thick vegetation and large treetops across the trail. The dog was trying to find his way around when the bank caved in and he fell in the river. The handler went in after the dog to try to get him

out safely.  Petitioner's head soon popped up out of a brush top, and he began to swim into the current.  The dog went after Petitioner, despite his handler's calls for the dog to come back.  Petitioner resisted the dog and the officers, who eventually took him into custody after a great deal of dangerous resistance.  Petitioner refused to give his name, and he was admitted to the hospital as John Doe until another officer identified him.

Detective Gordon testified that he talked to Petitioner a few weeks after Petitioner was released from the hospital, and Petitioner said that he had been mainlining, using heroin and cocaine intravenously, at the time of the chase so he did not remember anything. Gordon went back some time later, and Petitioner then acted as if he was confused and lethargic.  Gordon decided not to attempt questioning him in that state but explained that he was going to forward all of his information to the district attorney for prosecution for aggravated flight.  As Gordon was leaving, Petitioner said, "Boss, you really ought to reduce that charge because I wasn't really going that fast and all those lights were green."

Corporal Mary Jo Garrett testified (Tr. 337-54) that she heard Detective Gordon's request to stop the van because it matched the description of a suspect vehicle in other criminal matters.  She was in the area and soon saw the van on Caddo Street as it crossed Common Street.  She turned on her lights and siren on her marked vehicle, which activated her video recording system.

The van turned from Caddo onto Louisiana and stopped.  Corporal Morman pulled up behind Garrett, and Morman approached the driver's door while Garrett approached the passenger side.  As Morman reached the driver's door, she spoke to the driver, who then

immediately put the van into drive and sped off.  The officers returned to their cars and gave chase.

Garrett explained that she had changed the angle of her camera to better capture the traffic stop, but this apparently affected the view of the ensuing chase.  The video was played for the jury, and Garrett testified about the events.  The video showed that Garrett, who said she was about three blocks behind the van, encountered three green lights and one red light, which turned green as she arrived.  The van was not visible in the distance on the video, but Garrett testified that she could see it and that the lights the van went through were red.

The video depicted Garrett's speed based on GPS.  It indicated she was going 59 miles per hour across the bridge, where the speed limit was 35, and Garrett said the van was getting farther away.  When she turned on Traffic Street, the van was "quite a ways ahead of me."  Her speed varied from 26 to 47, as she stopped for stop signs.  Garrett testified that she never saw Petitioner brake or stop at any of the signs, and he continued to go at the same speed and get farther away.  No one was inside the van when Garrett found it stopped behind the levee.  Garrett recalled from the initial traffic stop that the driver was a white male with brown hair, and she did not see any other people inside the van.  Garrett conceded that the van did not commit any traffic offense before the traffic stop was initiated.

Corporal Morman testified (Tr. 356-68) that she heard Detective Gordon on the radio at about 2:15 p.m. say that he had come across a vehicle that he was looking for, possibly in reference to some burglaries, and officers were asked to stop the vehicle in a

marked unit.  Morman described the stop of the van on Louisiana Avenue.  She approached the driver's window, where she saw a white male, very slender, very nervous acting, with short brown hair.  She said this was the same man who was also later pulled from the river, and "there was nobody else in the vehicle."  Petitioner put the van in gear and drove away towards Texas Street, where he took a left and drove through the "very busy" downtown area in the middle of the workday.  Morman stated that there were "lots of cars, lots of people" and the officers had to avoid several possible crashes.  She recalled that the van went around some cars to get through one intersection.

Morman was asked if the van ran any red lights.  She said, "Yes, ma'am, he did." She said that she encountered some green lights, but there was at least one red light because she remembered being anxious about getting through the intersection safely.  She said the officers were driving slower than the van, not wishing to make it go faster, and just trying to keep it in sight.  Morman was asked if the van ran any stop signs on Traffic Street.  She said, "Several.  He never stopped."  She said she never saw the van brake at any time.  She described Traffic Street as a residential area with cars parked along the street and a 25 mph speed limit.  She estimated that the officers were going about 45 mph, and the van was much faster.  Morman said that the man pulled from the river was the same man she saw driving the van.

### C. <u>Jackson</u> and Habeas Corpus

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993). And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

**D. Analysis**

Aggravated flight from an officer "is the intentional refusal of a driver to bring a vehicle to a stop or of an operator to bring a watercraft to a stop, under circumstances wherein human life is endangered, knowing that he has been given a visual and audible signal to stop by a police officer *when the officer has reasonable grounds to believe that the driver or operator has committed an offense*." La. R.S. 14:108. 1(C) (Emphasis added).

Petitioner argues that the police may have had reasonable cause to believe that the van had been involved in a burglary, but they did not know who was driving the van, which was registered to a female from Minden, and they knew that the van was a different model than in a BOLO.  Petitioner argues that this knowledge may have been sufficient for a <u>Terry</u> stop, but he contends it was not sufficient to establish the element of the crime that requires the officer have reasonable grounds to believe that the driver has committed an offense.

The jury was instructed on this element of the offense and found that the officers had reasonable grounds to believe that the driver had committed an offense.  Petitioner raised this issue on direct appeal, and the state appellate court held that the "officers had reasonable grounds to believe that Defendant committed an offense because the vehicle he was driving matched the description of a vehicle that was involved in several recent burglaries, i.e., a tan-colored minivan with a missing front right hubcap."  Therefore, the court concluded, "It was reasonable for the officers to believe that the driver of this vehicle committed the offense of burglary."  Furthermore, Petitioner's flight from the officers indicated his consciousness of guilt and provided the officers with grounds to believe he committed an offense.  <u>State v. Byrd</u>, 145 So.3d 536, 543 (La. App. 2d Cir. 2014), <u>writ denied</u>, 161 So.3d 14 (La. 2015).

The appellate court applied the <u>Jackson</u> standard and found, when the evidence was construed in the light most favorable to the prosecution, that the jury's verdict was supported by sufficient evidence.  Petitioner apparently takes the view that the police must see the driver and have reason to believe that the particular driver committed an offense, but the statute is not written that narrowly.  It is reasonable to construe it to allow conviction

if the police have reasonable grounds to believe that the driver of a vehicle, whoever he or she may be, committed an offense. And that reason to believe can be based on the fact that the vehicle is suspected of being used in multiple crimes. The state courts appear to have employed that reasonable construction, and they have the last word on interpreting state law. This issue is foreclosed from being grounds for habeas relief because the state court's decision was not an objectively unreasonable application of the deferential <u>Jackson</u> standard.

Petitioner also challenges the sufficiency of the evidence to prove that he refused to stop "under circumstances wherein human life is endangered," which Section 14:108.1(D) states is any situation where the operator of the fleeing vehicle "commits at least two of the following acts: … (3) Exceeds the posted speed limit by at least twenty-five miles per hour … (5) Fails to obey a stop sign or a yield sign" or "(6) Fails to obey a traffic control signal device."

Petitioner argues that there was evidence that he ran red lights in Caddo Parish (Shreveport) but there was no evidence that he ran a stop sign in Caddo Parish. His argument implies that the traffic offenses that occurred in Bossier Parish, after he crossed the Red River, could not be considered. The State points out that Louisiana Code of Criminal Procedure Article 611(A) provides: "If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred." Article 612 adds that if an offense is committed on a vehicle while in transit and the exact place of the offense in the state cannot be established, the offense

is deemed to have been committed in any parish through which the vehicle passed and in which the crime could have been committed. Furthermore, the State did not have to prove that Petitioner ran both red lights and one or more stop signs. The Supreme Court of Louisiana has interpreted the statute and found that it "plainly encompasses the commission of one of the acts enumerated in that provision more than once. State v. Turner, 283 So.3d 997, 1000 (La. 2019). Accordingly, running two red lights or two stop signs would suffice with respect to this element.

The state appellate court affirmed the verdict over this challenge. It determined that human life was endangered during the pursuit because Petitioner "failed to stop at several stop lights in downtown Shreveport at approximately 2:20 in the afternoon on a busy work day with both pedestrian and automobile traffic." State v. Byrd, 145 So.3d at 543. This is supported by Officer Garrett's testimony that she saw Petitioner run multiple red lights on Texas Street in Shreveport. Accordingly, habeas relief is not allowed on this claim.

**Knowing Use of False Evidence**

Petitioner argues that the prosecution knowingly used false testimony from Detective Gordon. He bases this argument on slight differences between Gordon's testimony at a pretrial hearing and at the trial. Gordon testified at a hearing on a motion to quash/suppress that, when the van left the motel, he "called on the radio for officers in marked units to conduct a traffic stop so that I could attempt to identify the driver of the van." He was asked the purpose of the traffic stop, and he said it was, "To try to identify the driver, and see if the vehicle was actually the one that was on the video of the bar that had been burglarized, and to try to gain as much information as I possibly could." Tr. 263.

At trial, Gordon testified that the van left the parking lot "and I called for marked units to conduct a traffic stop so that I could try to identify the driver and obtain more information." He said he made a request on the radio. When asked if he indicated why the stop was needed, he said, "That I had a possible burglary suspect that was operating the vehicle that I needed to identify." Tr. 373.

Petitioner argues that Detective Gordon testified falsely at trial that he told officers to stop the van because he had a possible burglary suspect who was operating the van. He contends that prior to trial Gordon never mentioned that he believed the driver of the van was a possible burglary suspect. And he argues that the prosecutor knowingly used this alleged perjury to get a conviction.

"The Supreme Court has held that the Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction." Kinsel v. Cain, 647 F.3d 265, 271 (5th Cir. 2011) (citing Napue v. Illinois, 79 S.Ct. 1173 (1959). To establish a denial of due process through the use of perjured testimony, a petitioner must show "that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." Reed v. Quarterman, 504 F.3d 465, 473 (5th Cir. 2007).

Petitioner presented this claim in his post-conviction application. The trial court cited Napue and denied the claim on the grounds that Petitioner made only "general conclusory allegations" that did not prove any false statements by Detective Gordon. And, the court reasoned, if false statements were made, Petitioner had not shown that the prosecution was aware of them or that they were material to his conviction. Tr. 798. The

state appellate court summarily denied a writ application "on the showing made," citing the rule regarding a petitioner's burden. Tr. 955. The Supreme Court of Louisiana denied a writ application, citing that same rule, and noting that Petitioner "fails to satisfy his post-conviction burden of proof." Tr. 1125-26.

The state court's denial of this claim was a reasonable application of <u>Napue</u> to the facts. There was negligible if any difference between Gordon's testimony at the hearing and at trial. There is not enough difference between his statements to even begin to characterize his trial testimony as perjury or to demonstrate that any slight difference in his testimony would have affected the jury's verdict. Habeas relief is not permitted on this claim.

**Counsel of Choice**

Petitioner argues that he retained attorney Phillip Terrell, but the court violated his right to be represented by counsel of choice by forcing attorney Gerald Weeks to handle the trial. The minutes show that Petitioner made his first court appearance "present with B. Gerald Weeks" who enrolled as counsel. (Weeks was not appointed.) Weeks appeared in court four times before finally appearing and announcing ready for trial. The minutes do not indicate that Terrell or any other attorney ever enrolled or appeared for the defense. Tr. 1-2. After completing some pretrial matters, including the rejection of a plea offer, the court asked if the parties were ready for trial. Mr. Weeks answered, "We are, your honor." Tr. 314-15.

On the day jury selection began, Petitioner filed in the record a fee agreement that stated he employed "Phillip Terrell and his law firm" to represent him in connection with

criminal charges in Caddo and Bossier parishes.  The agreement was signed by Petitioner, who also placed his initials next to an arbitration clause.  There were spaces for attorney Terrell to sign and initial, but they remained blank, and the agreement was not dated.  Tr. 129-31.  The filing of the agreements was not accompanied by any motion, and Petitioner has not pointed to any mention of it in the trial transcript.

Three years later, Petitioner filed an affidavit from attorney Gerald Weeks in support of his post-conviction application.  Weeks stated that he had been licensed in Louisiana since 1977 and had represented Petitioner in a civil case about a year before being consulted regarding this criminal matter.  Weeks said his practice was concentrated in personal injury, with only limited criminal defense work early in his career.  Weeks said that he told Petitioner that he would speak with another lawyer, who had experience in criminal defense, and that Petitioner might retain him if they both agreed.  Weeks then contacted Phillip Terrell, but he had no knowledge of the specifics of the agreement between Petitioner and Terrell.

Weeks testified that, after criminal charges were filed in Caddo Parish, Terrell sought inpatient treatment for personal problems.  Because no one knew the length of his treatment, and because Weeks had some familiarity with the criminal case, he attended the initial arraignment.  Weeks stated that he never intended to represent Petitioner through the conclusion of the criminal proceedings, but, because of the situation with Terrell, he continued to appear for Petitioner.

Weeks stated that he recalled that on two occasions he raised the problem of Petitioner not having his chosen counsel, and he believes he filed the fee agreement in

conjunction with an oral motion to continue.  He also said that he recalled, at the beginning of the trial, making a similar motion on the issue that Petitioner was not represented by his chosen criminal counsel.  Tr. 792-94.  Neither Weeks nor Petitioner has pointed to any indication in the minutes or transcript that such requests or objections were made.  Petitioner states in his memorandum (p. 21) that he has tried every avenue of obtaining a copy of the record or minute entries regarding these discussions, to no avail.

One element of the Sixth Amendment right to counsel is "the right of a defendant who does not require appointed counsel to choose who will represent him."  United States v. Gonzalez-Lopez, 126 S. Ct. 2557, 2561 (2006).  A defendant has the "right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."  Caplin & Drysdale, Chartered v. United States, 109 S.Ct. 2646, 2652 (1989).  If the right is wrongly denied, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.  Gonzalez-Lopez, 126 S. Ct. at 2564-65.

But the right is not absolute.  Gonzalez-Lopez stated that nothing in its decision "casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice … . We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar. The court has, moreover, an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  Id. at 2565-66.  The Fifth Circuit applied these principles in U.S. v. Jones, 733 F.3rd 574 (5th Cir. 2013) and affirmed the denial of a

motion to substitute that came 13 days before trial and would have required a continuance of a complicated trial and might have compromised the availability of a key witness.

The trial court addressed this claim when it was raised in a post-conviction application. The court cited Gonzales-Lopez and determined that the right to counsel was not wrongfully denied because Petitioner provided no evidence that there was an actual agreement of representation with a different attorney or, assuming such an agreement, that the court in any way wrongfully denied the participation of such counsel. The evidence showed only that the allegedly retained Terrell entered treatment for an unknown length of time, which was not within the control of the court. Tr. 798-99. The appellate court and supreme court denied writ applications based on Petitioner's failure to carry his burden. Tr. 955, 1126.

Habeas relief is not permitted on this claim. The state court reasonably applied Gonzales-Lopez to deny the claim. The record contains no minutes or transcript to support the contention that the defense sought a continuance. The alleged retainer agreement is not signed by Terrell, and there is no evidence that Terrell ever attempted to enroll in the case or that he was willing and able to conduct the trial within any reasonable time. Given the lack of supporting evidence, this claim must be denied.

**Ineffective Assistance of Trial Counsel**

A police officer gathered 18 fingerprints from the van and was able to associate a person with 12 of them. Ten were determined to belong to Petitioner, and they were in places including two bottles found in the van, the driver door, passenger window glass, and fenders and body panels on both sides of the van. Two of the prints were determined to

belong to a Chad Morris; one print was on the driver-side hood and the other on the exterior shell on the driver-side front door. Tr. 827-28. (The van also held a crowbar, hammer and gloves. Officer Gordon testified that a common element of the burglaries was that the perpetrator broke into jukeboxes and other coin-operated devices in the bars.)

Petitioner argues that trial counsel was ineffective because he failed to investigate the viable defense that Chad Morris was really the driver of the van. He contends that an investigation would have led to the discovery of the fingerprints, which would prove that Morris was driving the van during the chase but managed to escape the officers after he crossed the levee and was out of their sight.

To establish ineffective assistance of counsel, Petitioner must demonstrate both deficient performance by his trial counsel and prejudice resulting from that deficiency. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). To show that his trial counsel's performance was deficient, he must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., 104 S.Ct. at 2064. To demonstrate prejudice from his trial counsel's deficient performance, he must show that his attorney's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. A petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." Gregory v. Thaler, 601 F.3d 347, 352 (5th Cir. 2010), quoting U.S. v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).

Petitioner presented this issue in his post-conviction application.  Tr. 726, 733-34. The trial court recited the Strickland standard and held that Petitioner had not met his burden of proof by offering mere general allegations and assumptions of a different result. Tr. 797-98.  The appellate and supreme courts summarily denied writs on the merits.  955, 1126.

Habeas relief is available only if the state court's decision on the merits was an objectively unreasonable application of Strickland to the facts.  It was not.  Corporal Morman testified that she saw Petitioner driving the van and "there was nobody else in the vehicle."  There was no hint at trial of any evidence of a second person in the van or its vicinity.  Petitioner does not allege what counsel could have found through additional investigation that would have gone beyond the fingerprints and provided a viable defense that Corporal Morman was mistaken and that Chad Morris was actually driving.  The state court's decision was a reasonable one, and habeas relief must be denied.

**Ineffective Assistance of Appellate Counsel**

### A. Introduction

Petitioner argues that appellate counsel was ineffective when he did not argue on appeal that (1) Petitioner was denied his right to be represented by counsel of choice and (2) the traffic stop violated the Fourth Amendment.  The Strickland requirements of deficient performance and prejudice also apply to this claim.  Amador v. Quarterman, 458 F.3d 397, 411 (5th Cir. 2006).

To establish that appellate counsel's performance was deficient, the petitioner must show that counsel was objectively unreasonable in failing to argue issues.  Smith v.

Robbins, 120 S.Ct. 746, 764 (2000). If he makes such a showing, he must establish actual prejudice by demonstrating a reasonable probability that he would have prevailed on appeal but for counsel's deficient performance. Id. Review of the state court's application of the Strickland standard is doubly deferential when Section 2254(d) applies, as it does in this case. Carmell v. Davis, 707 Fed. Appx. 295, 296 (5th Cir. 2017), citing Harrington v. Richter, 131 S.Ct. 770 (2011).

**B. Counsel of Choice**

Petitioner first argues that appellate counsel should have raised the counsel of choice issue discussed above. As discussed above, the trial record contained no support, beyond an unsigned retainer agreement, for the contention that attorney Phillip Terrell planned to enroll to represent Petitioner or that he was ready and able to try the case within a reasonable time. Appellate counsel would have had an insufficient basis for such a claim. The state court rejected this Strickland claim on the merits (Tr. 797-98, 955 & 1126), and that decision was not an objectively unreasonable application of Strickland to the record.

**C. Motion to Suppress**

Petitioner next argues that appellate counsel should have argued that the trial court erred in denying his motion to suppress. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 106 S.Ct. 2574, 2583 (1986); Shed v. Thompson, 2007 WL 2711022, *5 (W.D. La. 2007). This is a

habeas challenge under Section 2254(d)(1), so the Petitioner must establish not only that suppression of the evidence would be the correct result, but also that it would be contrary to or an unreasonable application of clearly established federal law for the state habeas court to rule otherwise.  Evans v. Davis, 875 F.3d 210, 219 (5th Cir. 2017).

Trial counsel filed a motion to suppress and/or quash that asked the court to suppress any statements or physical evidence because the police did not have probable cause to stop the van.  Tr. 122-23.  The court held a hearing, at which Detective Gordon testified about the surveillance evidence he obtained from the Tiki Bar that provided the description of the van and suspect.  He described how he located the van at a motel known for criminal activity, and how he asked patrol officers to stop the van because he "had reasonable suspicion that the person driving that van was responsible for committing numerous burglaries in my jurisdiction."  Tr. 270.  He conceded that the driver of the van committed no traffic offense and that he could not determine whether the driver was a white or Hispanic male.  After hearing argument, the court denied the motion based on a finding "that there was a valid Terry stop," noting that the stop was in a high crime area.  Tr. 293-94.

For a traffic stop to be justified under Terry, an officer must have an objectively reasonable suspicion, before stopping the vehicle, that some sort of illegal activity has occurred or is about to occur.  U.S. v. Breeland, 53 F.3d 100, 102 (5th Cir. 1995).  Officers Garrett and Morman made the stop based on the direction of a fellow officer who had investigated a case and determined that the van matched the description of one that was likely involved in several burglaries.  The stop was consistent with Fourth Amendment

jurisprudence that allows an officer to make an investigatory stop based on a police bulletin or dispatcher report issued on the basis of articulable facts supporting reasonable suspicion that the person has committed an offense.  U.S. v. Hensley, 105 S. Ct. 675, 682 (1985); see also United States v. Ibarra-Sanchez, 199 F.3d 753, 759–60 (5th Cir. 1999) (upholding a traffic stop and search by officers acting on a police dispatcher's bulletin under the "collective knowledge" doctrine) (citations omitted); United States v. Gonzalez, 190 F.3d 668, 672 (5th Cir. 1999) (noting that "an alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop").

Detective Gordon  had articulable facts that presented a good case for establishing reasonable suspicion to stop the van.  The trial court made a finding that such reasonable suspicion existed, and appellate counsel would have had a difficult time persuading the appellate court to overturn that finding.  Considering the deferential standard of Strickland as it applies to appellate counsel, together with the deference Section 2254(d) requires to be afforded the state court's decision to deny the post-conviction application, habeas relief is not allowed on this claim.

**Supplemental Claims**

**A. State Court Proceedings**

Petitioner filed a civil rights complaint in this court that alleged excessive force during his arrest.  Judge Foote held a trial, the jury returned a verdict for the defendants, and the verdict was affirmed on appeal.  Byrd v. Lindsey, 736 Fed. Appx. 465 (5th Cir. 2018), cert. denied, 139 S.Ct. 1565 (2019).  Petitioner later filed a second post-conviction application in state court and claimed that the three officers who testified at his criminal

trial "conceded" during the federal civil trial "that their testimonies in Mr. Byrd's criminal trial for aggravated flight from an officer was false." Tr. 1127, 1137. He contended that an enlargement of the video that was shown at the federal trial showed that he did not run any red lights or stop signs, so the state court prosecutors who possessed the video knowingly used false testimony from the officers at his criminal trial. Tr. 1138. Petitioner also filed in the state court a motion for production of evidence that asked the court to order the federal court to provide a transcript of the three officers' testimony from the civil rights trial. Tr. 1148-55.

The trial court stated that the post-conviction application "possesses a myriad of procedural errors," including a lack of affidavit of verification, being successive, and being untimely. The court also denied the request for transcripts. Tr. 1177-79. The appellate court held that the claims were time-barred and that the proper avenue for seeking a copy of the transcripts was with the federal court. Tr. 1248. The Supreme Court of Louisiana denied a writ application and noted that Petitioner had "previously exhausted his right to state collateral review and fails to show that any exception permits his successive filing." Tr. 1330.

Petitioner then filed with this court a supplemental habeas petition to support newly exhausted claims. He argued that (1) the prosecution knowingly used false evidence, (2) the trial court abused its discretion by denying his post-conviction application without conducting an evidentiary hearing, and (3) the trial court abused its discretion by not granting his motion that requested copies of the federal transcript.

The State asserts a procedural bar defense to these claims, and it likely has merit. But the court need not decide a procedural bar issue if it instead chooses to deny a claim on the merits. <u>King v. Davis</u>, 883 F.3d 577, 585 (5th Cir. 2018) (electing to ignore the procedural bar and cut to the "core of the case," the merits of the underlying claims). That is the course that will be followed here.

### B. Knowing Use of False Testimony

#### 1. Corporal Garrett

Petitioner has filed transcripts of the federal civil testimony given by Officers Garrett, Morman, and Gordon in response to Petitioner's questions (but not in response to questions from defense counsel). Petitioner questioned Corporal Garrett with the benefit of an enlarged display of the video from her patrol car. He questioned Garrett about various intersections, asking if the light was green or red, and Garrett said green except in response to one light which she agreed with Petitioner was red. Doc. 32-1, Garrett Testimony at pp. 19-23. There were questions about the speed of Garrett's car as she crossed the bridge. pp. 23-26.

Petitioner argues that this testimony shows that the prosecution knew that he did not run any red lights or stop signs because the video was in the State's possession before trial. Petitioner contends that Garrett "admitted" that her testimony in the criminal trial was false, but that is not accurate. Garrett testified in the federal trial that she wrote in her narrative supplement, based on her memory, that Petitioner ran four red lights. Petitioner repeatedly attempted to get Garrett to say that her memory was incorrect, but she refused to do so. He

asked, "Did I go through four red lights?"  She answered, "Yes."  She later added, "I remember you went through four red lights."  pp. 36-38.

There is obviously a discrepancy between what Petitioner believes the video depicts and what Corporal Garrett recalls seeing.  Petitioner may have been able to do a better job of cross-examining Garrett at the civil trial, but that is a far cry from Garrett conceding that she gave false testimony at the criminal trial.  She made no such concession, and the State's mere possession of the videotape that did not fully depict each of the violations testified to by Garrett does not amount to knowing use of false testimony.  As for Petitioner's quibbles about the speed of the cars, it is not critical because the state appellate court that affirmed his conviction did not rely on a finding that he was speeding in excess of 25 mph to support his conviction.

### 2. Corporal Morman

Petitioner argues that Corporal Morman "admitted that Mr. Byrd did not run the stop lights as indicated in her testimony in Mr. Byrd's criminal trial."  Morman testified in the federal trial that she wrote in her report that the driver of the van "disregarded all traffic lights as he proceeded eastbound on Texas Street."  Petitioner asked if it was her testimony that he ran every single light.  Morman said that when she wrote that he "disregarded" the signals, it meant that Petitioner "never even stopped to check any other traffic; you just kept going, you had the same speed and kept speeding the whole time."  She added that when Petitioner had a green light "you were still travelling at a high rate of speed."  After she and Petitioner quibbled over the meaning of disregarded and what one should do at a traffic signal, she clarified, "You disregarded all red lights.  How's that?"  She later added

that she could see the traffic lights and she never saw the van's brake lights come on.  Doc. 32-1, Morman Testimony at pp. 26-29 & 55.  Once again, Petitioner overstates what happened at the federal trial.  Morman did not admit that Petitioner did not run stop lights. Rather, she stuck to her testimony that he ran all lights that were red.  There is nothing in her testimony that would allow habeas relief based on knowing use of false testimony.

### 3. Detective Gordon

Petitioner argues that Detective Gordon admitted at the federal trial that there were no reasonable grounds to believe or suspect that Petitioner was involved in past or present criminal activity, which Petitioner says is important regarding whether he committed aggravated flight from an officer and whether there were grounds for a traffic stop. Petitioner contends that Gordon testified falsely that he told other officers to stop the van because he had a possible burglary suspect that he needed to identify, yet Gordon admitted that he did not know who was driving the van.

Petitioner questioned Gordon at the federal trial about the photo of the van that was the basis for his investigation.  Gordon explained that he did not actually see the video from the Tiki Bar camera system.  Rather, another officer obtained the photo from someone at the bar.  Petitioner wanted to know whether there had been forensic computer work done to verify the authenticity of the video and photo.  He also asked whether it was possible that the person who drove the van into the bar parking lot and left about 14 minutes later could have been stopping to change a tire, and Gordon allowed that it was possible. Petitioner also contends that it is important that Gordon testified at the federal trial that the person driving the van could have been a mere witness to the burglary, and Gordon

admitted that he would have pulled over anyone who was driving that van.  Doc. 32-1, Gordon Testimony at pp. 4-12.

Nothing in that testimony establishes that Gordon's testimony at the criminal trial was false.  Petitioner developed some additional facts regarding the investigation, but Gordon's testimony on those points was generally consistent with his testimony at the criminal trial.  The additional facts also did not undermine the existence of reasonable suspicion to make the traffic stop and satisfy the element of aggravated flight.  Much of Petitioner's argument on this claim is like earlier ones; it is based on his implied view that police cannot reasonably suspect a driver of a vehicle of committing a crime unless they have identified the driver and link him by name or description to a crime.  But police routinely and legally stop vehicles that match the description of a vehicle used in a crime, and they would often be derelict in their duty if they failed to do so.  That police may have no idea who is driving does not deprive the stop of a legal basis or preclude the unknown driver from being considered a suspect.

### C. No Evidentiary Hearing

Petitioner argues that the state court abused its discretion by denying his post-conviction application without an evidentiary hearing to allow him an opportunity to present his new evidence.  The federal habeas court does not sit to correct procedural errors alleged to have happened in the postconviction process.  "[I]nfirmities in State habeas proceedings do not constitute grounds for relief in federal court."  Rudd v. Johnson, 256 F.3d 317, 319 (5th Cir. 2001).  See Kinsel v. Cain, 647 F.3d 265, 273 (5th Cir. 2011).

These rules have been relied upon to reject habeas claims that the state court should have held an evidentiary hearing on a post-conviction application.  Mathis v. Dretke, 124 Fed. Appx. 865, 871-72 (5th Cir. 2005).  There is no requirement that the state court hold a full and fair hearing before it denies a postconviction application, and the federal court applies a presumption of correctness to state court findings even absent such a hearing.  Id., citing Valdez v. Cockrell, 274 F.3d 941, 949 (5th Cir. 2001).  Petitioner is not entitled to habeas relief based on the lack of an evidentiary hearing in the state post-conviction process.

### D. Denial of Transcripts

Petitioner argues that the state court erred when it denied his Bernard motion to produce a copy of the transcript of the federal civil trial.  The motion relied on State ex rel. Bernard v. Crim. Dist. Ct. Section J., 653 So. 2d 1174 (La. 1995), which held that an inmate may file a post-conviction application and identify with factual specificity constitutional claims, even absent supporting documents, and make a request for the documents in the application.  The trial court then determines whether the documents are necessary to resolve the claims fairly under state procedure.

The habeas statute provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law."  Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).  Habeas relief is not available even if Petitioner were correct on this state law issue.

Furthermore, the state court had no authority to order the federal court to produce federal civil transcripts for a prisoner to use for his post-conviction application. And, finally, Petitioner was able by other means to get the federal transcripts he wanted. He filed them with this court, they were reviewed above, and the undersigned found that they do not provide a basis for a valid claim of knowing use of false testimony. Thus, Petitioner suffered no prejudice from the lack of the transcripts during his state post-conviction proceedings.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 15th day of June, 2021.

Mark L. Hornsby
U.S. Magistrate Judge